**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 14-284** |
| v. | * | **SECTION: "H"** |
| **BRANDON LICCIARDI** | | |
| **ERIK NUNEZ** | * | |

\* \* \*

**GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANTS'
MOTIONS IN LIMINE (DOCS. 376–382, 384 & 385)**

The passel of *in limine* motions filed collectively by the defendants must be placed in context. None of them has merit, but their, let us euphemistically say, novelty makes response to them somewhat challenging. At the risk of sounding harsh, some of those motions are so unusual as to defy response, for fear a well-reasoned reply might dignify them. Indeed, the defendants cite no authority to support their more arcane requests, since no such authority exists, doubtlessly because their propositions are too outlandish to have been raised to an appellate court. Concomitantly, no countervailing authority can be identified if there is no authority to counter. And, if a case is cited, as Licciardi points to *United States v. Monaghan*, [1] its holding is distorted beyond recognition.

To the extent they can be categorized, the *in limine* requests fall into three subsets: re-arguing issues that the Court has already decided against the defendants; motions so off-the-wall as to defy intelligent response; and blatant mis-application of case law.

For example, the Court has denied Licciardi's motion to suppress the Ohm video, yet he re-hashes the same motion by slightly altering his theory, from the doctrine of completeness to Rule 403, marked by overwrought rhetoric (as in the surveillance video is so "extremely prejudicial" that it risks "coaxing the jury into the emotional conclusion" he drugged LL).

---
[1] 741 F.2d 1434 (D.C. Cir. 1984).

Or, Nunez moves to forbid use of the term "rape kit" and to exclude testimony about the properties and usage of benzodiazepines, because, according to Nunez, the evidence would necessarily lead to the ineluctable conclusion that he committed sexual assault. The novelty of those motions is reflected by the fact that no case is cited to support them.

And, Licciardi blithely insinuates that *Monaghan* "held" that a rebuttal argument holding a police officer to a higher standard was fatally prejudicial, when that case actually stood for anything but; more accurately, *Monaghan* ultimately endorsed such an argument.

No number of loose, adjective-laced phrases or ritualistic incantations of "unfair prejudice" disguises the reality that none of the *in limine* requests has merit; such motions to exclude relevant evidence are, in fact, disfavored and rarely granted. Nor do the defendants articulate extraordinary reasons to justify exclusion. Taken as a whole, the motions are a collection of what can more accurately, and bluntly, be described as penny-ante, warmed-over versions of previous motions already denied by the Court.

While "[t]he trial judge's job is to avoid unfair prejudice," the Court "is not required to scrub the trial clean of all evidence that may have an [incriminatory] impact." *United States v. Morales-Aldahondo*, 524 F.3d 115, 120 (1st Cir. 2008). Since Rule 403 allows the exclusion of relevant evidence, it is an extraordinary remedy that should be used sparingly. *United States v. Morris*, 79 F.3d 409, 412 (5th Cir. 1996) (citations omitted). The exclusion of otherwise relevant evidence must rest on its character as unfairly prejudicial, cumulative, or the like, its relevance notwithstanding. *United States v. Crowder*, 141 F.3d 1202, 1206 (D.C. Cir. 1998) citing *Old Chief v. United States*, 519 U.S. 172, 179 (1997)). Analyzing the issue, the Court must weigh the probative value of each category of the defendants' challenged evidence against the risk that such evidence will be unfairly prejudicial to determine whether it will be admissible at trial.

The question, however, does not stop at deciding if the evidence is prejudicial only; indeed, it is obvious that all evidence is designed, to a greater or lesser degree, to prejudice one's opponent, and the inquiry therefore reverts to whether the undue prejudicial effect of the evidence substantially outweighs its probative value. The function of Rule 403 is to exclude only matters of "slight probative force dragged in by the heels for the sake of prejudicial effect." *United States v. Leahy*, 82 F.3d 624, 637 (5th Cir. 1996). Of course, "unfair prejudice" as used in Rule 403 is not to be equated with testimony adverse to the opposing party. Virtually all evidence is prejudicial or it isn't material. The prejudice must be "unfair." *Dollar v. Long Mfg., N.C., Inc.,* 561 F.2d 613, 618 (5th Cir. 1977). And, evidence is "unfairly prejudicial" when it "tends to suggest decision on an improper basis," *United States v. Houston*, 813 F.3d 282, 291 (6th Cir. 2016), or "if it creates a risk that invites an irrational emotional response from the jury." *United States v. Seals*, 813 F.3d 1038, 1043 (7th Cir. 2016). Not one of the *in limine* motions describes unfair prejudice that would justify exclusion of relevant evidence:

### Doc. 376: Motion In Limine To Exclude Licciardi's Out-of-Court Statements

#### A. Licciardi's Testimonial Statements

The government does not plan to introduce the statements Licciardi gave to the New Orleans Police Department and the Orleans Parish District Attorney.

#### B. The Text Messages Among The Defendants And Victims Have Already Been Deemed Admissible

Once again the defendants re-heat a motion to exclude their text messages, despite the Court's implicit ruling in its orders, twice denying the severance motion, that they are admissible. (*See, e.g.* Doc. 392) Now camouflaged as a hearsay objection, the *in limine* request persistently mis-describes the law. Just as the defendants' earlier characterization of the texts as

"classic *Bruton*," was classically wrong, so is their warmed-over claim that the texts offend the rules against hearsay.

The defendants incorrectly assert that the texts are not admissible as co-conspirator hearsay because they did not "further the conspiracy," which implies that the texts must have actually succeeded in furthering the objectives of the conspiracy. But if the rule were interpreted that way it would "lose most of its value to the system of justice." *See* Weissenberger's Federal Evidence, § 801.24 (5th Ed. 2007); *United States v. Miller,* 664 F.2d 94, 98 (5th Cir. 1998) ("Puffing, boasts, and other conversations are admissible when used by the declarant to obtain the confidence of one involved in the conspiracy or to allay suspicions").

The text messages generated soon after the September 23, 2013 rapes of DD and JW went well beyond "idle chatter." The defendants, along with Sharper, variously contacted the victims to gauge their attitude; checking if they were oblivious to what happened, meaning the drugs worked and the defendants were safe from arrest, or if the victims were suspicious and hostile to them. Nunez even perversely teased JW into believing she had a lesbian tryst, proving that he well knew she was drugged. And Licciardi pressed Sharper about the details of the assaults, being especially disturbed about Nunez having sex with DD: "I can't believe you let E fat ass beat [have sex with] [DD]," again showing that she was drugged, incapable of giving her own consent, and that Sharper, not her, decided to let Nunez "beat."

The texts are admissible under several theories, including that allowed by Rule 801(d)(2) as party admissions, and as declarations against interest under Rule 804(b)(3). The texts are relevant; they are non-testimonial, so *Bruton* is not implicated; and they are not "unfairly prejudicial" because they will not "invite an irrational response from the jury."

4

### Doc. 377: Motion In Limine To Prevent Interpretation of
### Evidence That is Self-Explanatory

This motion is a premature, overly broad, and generalized request that, in its breadth, is akin to an omnibus motion to preclude any testimony that might be objectionable. Nunez's suggested proscription is also speculative, predicting that the prosecution will adduce testimony beyond the ken of its (unnamed) witnesses.

Additionally, Nunez bases his amorphous proposition on the accusation, without citing any example, that "[t]hroughout this case, the prosecution team has made comments in court, in reports, and to the news media regarding its 'beliefs,' 'opinions,' and 'interpretations' of certain evidence. Such *testimony*, however, is not appropriate for trial because it invades the province of the jury as finder of fact. Such t*estimony* is also prejudicial and irrelevant." (Doc. 377-1 at 1) (emphasis supplied) No member of the prosecution team has "testified" about "beliefs," "opinions," or "interpretations" of evidence, nor will any prosecutor so "testify" at trial.

Just as in every other trial over which the Court has presided, it will deal with any objections raised and take appropriate action. The United States is aware of the evidentiary rules and will honor them. This motion, so anticipatory and vague that it states nothing to which to respond, is unnecessary.

### Docs. 378 and 379: Motions In Limine to Disallow Reference To "Rape Kit"
### And Testimony By Expert Forensic Pharmacologist

In a series of requests, united only in their misplaced creativity, the defendants: move to exclude any reference to "rape kit": move to preclude the testimony of FBI expert forensic pharmacologist Dr. Cynthia Morris-Kukoski; and move to prevent reference to "other co-conspirators." None of these has merit.

In another typically recherché argument, Nunez illogically argues that use of the term

" 'rape kit' incorrectly and inappropriately implies that a rape in fact occurred." (Doc. 378) Nunez's exiguous filing, however, is devoid of any authority to support his novel proposition. The phrase "rape kit" is shorthand for the evidence gathered concomitant with the examination of a possible rape victim by a SANE nurse (sexual assault nurse examiner). It defies logic how use of the term forces the conclusion that a rape has occurred, and the mere suggestion is, quite frankly, absurd. Would Nunez object to use of the word "rape" at any time during the trial? After all, the indictment mentions that the defendants administered drugs to facilitate "rape." Does Nunez ever define how use of "rape kit" generates "unfair prejudice"? Does Nunez cite any support for excluding the term? The answer to all these reasonable queries is "no." The term is relevant. (Doc.378)

Nunez neglects to mention that victim DD used it in a text conversation on the morning of September 23, 2013, soon after she was raped; TS, in the same text message traffic, also advised DD to get a "kit" done; and Licciardi himself used the term in a consensual conversation with a cooperator when he admitted that if MB had undergone a "rape kit," he was "f***ed."

Along similar lines, Nunez moves to prohibit Dr. Morris-Kukoski from testifying on the characteristics of benzodiazepines, commonly used in drug-assisted sexual assaults, claiming, again baselessly, that such objective, scientific evidence "supplants the jury's role, by offering an 'expert' opinion on an element that the jury, and the jury alone must determine beyond a reasonable doubt: whether Erik Nunez distributed a specific drug, to a specific person, with the intent to rape that person." (Doc. 379-1) Nunez's argument is a complete *non sequitur*: expert testimony on the abuse of certain drugs in no sense amounts to testimony that Nunez "must have distributed the drug *with the intent to commit rape.*" (*Id*. at 2) (emphasis in original) Nunez's logic is, to be charitable, flawed. Typically, he offers no authority whatsoever to support

6

exclusion.  Indeed, to extend Nunez's illogic to its equally absurd end, no expert forensic chemist, toxicologist, or pharmacologist would ever be able to describe the properties of drugs and how they may be used to facilitate crimes in any case.  No court has gone so far as to accept such an extreme suggestion.

### Doc. 380: Motion In Limine to Preclude Arguing Licciardi Had An "Enhanced Duty" As A Police Officer

Licciardi misleads by asserting *United States v. Monaghan* "held" that an argument a police officer should be held to a higher standard was improper: in fact, the court "held" no such thing.  Taking Licciardi at face value, one would expect *Monaghan* to have reversed the conviction because of the allegedly improper comment.  But that is not the case.

The "higher standard" argument did not even appear in the headnotes.  Monaghan was a Washington transit cop who picked up a 14-year-old runaway in a gay bar.  He brought the prostitute home, and during their two-week cohabitation had one sexual assignation.  Monaghan was convicted of committing oral-genital sodomy in a case the dissent called "weak at best." 741 F.2d at 1444.  Monaghan did not testify on his own behalf and his appeal focused on indirect references about his failure to take the stand.

The D.C. circuit never "held," but the government nonetheless conceded, that arguing Monaghan should have been held to a higher standard may have been "unnecessary and improper," but even if it hadn't so decided, the conviction would not have been disturbed.  The court commented that "[h]ere, the improper remarks were '"minor aberrations in a prolonged trial" ' rather than '"cumulative evidence of a proceeding dominated by passion and prejudice."'" *Id.* at 1443.  Going even further, the opinion concluded that any "prejudice which [the remarks] [may have] engendered was *insubstantial* or *nonexistent*" (*Id.*) (emphasis added), an important qualifier that Licciardi deceptively refused to acknowledge in his motion.

7

Licciardi also ignores that *Monaghan*, contrary to his false impression, stated that "It may also be true that …the appellant's status as a police officer may have been relevant to the issue of his knowledge and intent." *Id.* at 1442 n.35.

Licciardi's status as a police officer facilitated his involvement in the conspiracy. Naturally, his victims felt re-assured that no harm would come to them at the hands of Licciardi for the very reason that he was a cop. That false assurance also goes to explain why some victims, rendered amnesiac by the defendant, hesitated to come forward, finding it hard to accept that they would have been drugged to further a sexual assault at the hands of a police officer. And, Licciardi's failure to extricate his supposed friend DD from the clutches of Sharper and Nunez on September 23, 2013, cannot be separated from his status. His inaction was not mere passivity; it was a conscious choice to allow rape to happen, and the jury should consider it in its proper context.

Relevant evidence of Licciardi's occupation should not be "scrubbed" from the case. Licciardi cannot pass himself off as a mere innocent bystander to the rapes which, as a cop, he facilitated. He did nothing to interfere with the attacks on DD and JW, when he well knew that a crime was occurring under his nose. Otherwise, why would he concede in a later text message words to the effect that DD would not have had sex with Nunez "unless she was f***ed up."

Licciardi cites to no case standing for the proposition that arguing a police officer should be held to a higher standard is reversible; nor could such a case be located. Quite to the contrary, albeit in a different context, authority has endorsed that very argument; "Because they hold the public trust, police officers are held to a higher standard     and even off-duty conduct which is not illegal can be regulated by their employer." *Foust v. Police Civil Serv. Comm'n*, 347 A.2d 765, 768 (Pa. Commw. Ct. 1975); *Lodge No. 5 of Fraternal Order of Police v. City of*

8

*Philadelphia*, 2013 WL 638615 (E.D. Pa.) at *11 (it is "necessary that police officers avoid the appearance of having any motives other than protecting the public"). This motion should be denied.

### Doc. 381: Motion In Limine to Preclude Evidence Of Licciardi's Domestic Violence And Gambling

The United States does not intend to offer evidence of Licciardi's physical violence toward, especially, his ex-girlfriend Taryn Parker, or evidence of his gambling activities, reserving the option to introduce such evidence if Licciardi should open the door to it, such as bringing his character into play.

### Doc. 382: Motion In Limine To Preclude Reference To Co-Conspirators

Puzzlingly, Licciardi is fixated on the idea of "co-conspirators." Reflecting that obsession, he moves in *limine* to preclude "reference to any co-conspirators." (Doc. 382-1) He moves to forbid reference to the "others unknown to the grand jury" mentioned in the Fifth Superseding Indictment. So, Licciardi is asking the government what is akin to proving a negative: if there are "others unknown" to the government, how can the government refer to them if it does not know who they are. This motion is incoherent and it defies response.

### Doc. 384: Motion In Limine To Preclude Admission of Ohm Video

The Court has already denied Licciardi's motion to suppress the Ohm video. (Doc. 302.) Refusing to accept the ruling, Licciardi re-urges the same motion, but this time invoking Rule 403 and infusing his argument with overwrought rhetoric, such as the video's admission would be "overwhelming (sic) prejudicial" to the defendant in light of its "questionable (at best) probative value." (Doc. 384-1) Regurgitating the argument in his motion to suppress, Licciardi objects that the video does not include "preceding footage that shows LL drinking heavily." (*Id.*)

9

Licciardi, then, wants to exclude available evidence in favor of speculation about what does not exist, which, again, makes no sense.

The hearing on the suppression motion proved that no government agency had a hand in isolating the portions of the Ohm video, as that decision was made by Ohm management, who selected portions it thought germane to the question of whether LL was dosed with a debilitating substance. Furthermore, Licciardi implies that the video evidence would give the jury a skewed version of facts, "without allowing the defendant to challenge that theory with additional video evidence." (*Id*.) But no additional evidence even exists. He also deceptively states that portions of the video were "edited out," again inferring that the government nefariously manipulated the tape. The Court conducted a full hearing on the motion to suppress that explored how the Ohm surveillance video was preserved.

Finally, disregarding the testimony at the suppression hearing, Licciardi misleadingly proclaims that the Louisiana Attorney General's Office concluded that the video "did not show anything being placed in LL's glass and therefore did not believe that probable cause existed to even arrest the defendant" (Doc. 384-1 at 2). The tape speaks for itself and shows what it does. As if the AG's decision had anything to do with this case, Licciardi's comment is taken out of context: the attorney general's representatives testified at the hearing that they did not have the benefit of knowing the full context of other victims and events comprising the evidence, and chose not to charge Licciardi based on the limited information they had. But, they did not in any sense exonerate him. Apart from Licciardi's overheated rhetoric, nothing suggests that the Ohm video should be suppressed.

**Doc. 385: Motion In Limine to Preclude Admission of 404(b) and 413 Evidence**

This motion was filed before the Court issued its ruling in Document 392 (as Licciardi noted "this Court has not yet ruled on the request." (Doc. 385 at 1)). Therefore, it is moot.

Respectfully submitted,

KENNETH ALLEN POLITE, JR.
UNITED STATES ATTORNEY

s/ Michael E. McMahon
MICHAEL E. MCMAHON
Assistant United States Attorney
Louisiana Bar Roll No. 10095
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130
Telephone: (504) 680-3027
Email: michael.mcmahon@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on June 15, 2016, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all defense counsel of record.

s/ Michael E. McMahon
MICHAEL E. MCMAHON
Assistant United States Attorney