UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 14-284 |
| v. | * | SECTION: "H" |
| ERIK NUNEZ | * | |
| | * * * | |

**UNITED STATES' MEMORANDUM IN OPPOSITION TO DEFENDANT NUNEZ'S MOTION TO SUPPRESS EVIDENCE; REQUEST FOR A *FRANKS* HEARING; AND SUPPLEMENT TO MOTIONS TO DISMISS FOR VINDICTIVE PROSECUTION AND FOR INSPECTION OF GRAND JURY MATERIALS (REC. DOC. 396)**

The United States, through the undersigned Assistant United States Attorney, respectfully submits this Memorandum in Opposition to Defendant Erik Nunez's Motion to Suppress, Rec. Doc. 396. At the core of Nunez's motion is a challenge to AT&T's production of one particular category of cell site location information which, according to Nunez, was obtained by the government unlawfully pursuant to an application and order under 18 U.S.C. § 2703(d). As discussed *infra*, the government does not intend to introduce the contested data in its case-in-chief; accordingly, the entirety of Nunez's motion is moot. Nonetheless, Nunez's substantive claim that the government committed a Fourth Amendment violation in securing the contested data is both factually inaccurate and legally unsupportable. Significantly, Nunez seeks to have a *Franks* hearing based on his contention that the government knowingly made material misstatements in support of its application for cell site data. These claims are reckless and wrong, as demonstrated by the paucity of evidence submitted in support thereof. For the reasons set forth below, the government requests that the Court deny Nunez's motion without a hearing on the merits.

I.      **Legal Background**

At issue here is AT&T's production to the government of cell site location information pursuant to an order under § 2703(d) of the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701–2712. By way of background, the SCA regulates disclosure of stored electronic communications by service providers. *In re U.S. for Historical Cell Site Data*, 724 F.3d 600, 606 (5th Cir. 2013) (hereinafter, "Historical Cell Site Data Opinion"). The Act requires the government to secure either a warrant or a court order to compel disclosure of certain records held by a cellular telephone service provider, such as AT&T. 18 U.S.C. § 2703(c). If the Government seeks a court order, such an order:

> [M]ay be issued by any court that is a court of competent jurisdiction and shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation.

§ 2703(d). Thus, the SCA requires merely that the government offer "specific and articulable facts" showing that there are "reasonable grounds to believe" that the information sought is "relevant and material to an ongoing criminal investigation." *Id*. This reflects a lesser showing than the probable cause standard required by the Fourth Amendment to secure a search warrant. *Historical Cell Site Data Opinion*, 724 F.3d at 606; *see also In re Application of the United States*, 620 F.3d 304, 315 (3d. Cir. 2010) (holding that "§ 2703(d) creates a higher standard than that required by the pen register and trap and trace statutes" but "a less stringent [standard] than probable cause").

One category of information covered under § 2703(d) is historical cell site location information, or "CSLI." By way of background, mobile telephone service providers use a system of towers to receive and transmit signals from mobile phones. *United States v. Epstein*,

2015 WL 1646838, at *1 (D.N.J. Apr. 14, 2015) (unpublished). When a mobile telephone user places or receives a call, sends or receives a text message, or accesses data, the phone sends an electronic signal to a cellular tower. *Id.* Service providers on their own generate and retain records that identify the particular tower to which a user's telephone was connected. *Id.* These records reflect the cell site location information, or CSLI. *Id.* Thus, the CSLI identifies the precise location of the cell tower and cell site serving the subject cell phone during each voice call, text message, or data connection, albeit without providing the precise location of the cell phone itself. *Id.*

To date, every circuit to address the question, including the Fifth Circuit, has held that a § 2703(d) order is an appropriate vehicle for obtaining CSLI. *See In re Application of the United States*, 620 F.3d at 313 (finding that "CSLI from cell phone calls is obtainable under a 2703(d) order and that such an order does not require the traditional probable cause determination"); *United States v. Graham*, No. 12-4659, 2016 WL 3068018, at *1 (4th Cir. May 31, 2016) (en banc) ("We now hold that the Government's acquisition of historical CSLI from Defendants' cell phone provider did not violate the Fourth Amendment."); *Historical Cell Site Data Opinion*, 724 F.3d 600; *United States v. Guerrero*, 768 F.3d 351 (5th Cir. 2014); *United States v. Carpenter*, 819 F.3d 880 (6th Cir. 2016); *United States v. Davis*, 785 F.3d 498 (11th Cir. 2015) (en banc).

Moreover, the use of § 2703(d) orders to secure CSLI has been found to be reasonable. Where a government action is not a traditional search, the government action is evaluated "under traditional standards of reasonableness by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999). Obtaining CSLI via a § 2703(d) order satisfies that standard. Congress did not "lower

3

the bar from a warrant" in enacting § 2703(d); to the contrary, "requiring a court order under § 2703 raises the bar from an ordinary subpoena to one with additional privacy protections built in." *Davis*, 785 F.3d at 505-06.

The privacy invasion from a § 2703(d) order for CSLI is minimal. First, unlike the GPS data from a tracking device installed by the government, cell site records are already known to the phone company, thereby diminishing any privacy interest in the records. *See Maryland v. King*, 133 S. Ct. 1958, 1969 (2013). Second, the generalized location information at issue does not reveal highly private or sensitive information. Third, the statute's privacy protections guard against improper acquisition or distribution of CSLI. *See King*, 133 S. Ct. at 1979-80 (considering statutory protections). The government can obtain cell site records only pursuant to a judicially-issued court order based on "specific and articulable facts" that the records "are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Moreover, the statute prohibits willful improper disclosures of records obtained pursuant to § 2703(d), subjecting offenders to civil liability and administrative discipline. *See* 18 U.S.C. § 2707(a), (d), (g). These features minimize any privacy invasion.

## II.     Factual Background

On or about April 7, 2015, the government filed an application under § 2703(d) seeking evidence relevant to its investigation of Erik Nunez. *See* Defense Exhibit F. The application requested a court order compelling AT&T, a cellular service provider, to provide CSLI and other subscriber information for a cellular phone number that had been linked to Nunez. The application requested CSLI for three distinct time periods—February 1-3, 2013; August 31-September 1, 2013; and September 22-23, 2013—coinciding with the approximate dates of sexual assaults that were under investigation. To be clear, the application did not request the far

more precise GPS data, much less the contents of communications over Nunez's phone. Rather, the application employed what has become common phrasing in § 2703(d) applications, in requesting "[a]ll data about which 'cell towers' (*i.e.*, antenna towers covering specific geographic areas) and 'sectors' (*i.e.*, faces of the towers) received a radio signal" from Nunez's phone during the requested intervals. *See, e.g.*, *United States v. Wheeler*, No. 15-CR-216-PP, 2016 WL 1048989, at *2 (E.D. Wis. Mar. 14, 2016). On April 7, 2015, Magistrate Judge Sally Shushan signed the requested order and the government sent the order to AT&T to compel production.

Sometime thereafter, AT&T produced to the government a 137-page report (hereinafter, the "AT&T Report"), detailing the CSLI for Nunez's phone during the requested dates. This report, which is the centerpiece of Nunez's argument, was attached to his motion as Defense Exhibit G.

Some orientation to this report is helpful. Each line item number on the far-left column of the report reflects a separate connection between Nunez's phone and a cell site tower. The geographic coordinates of the connected tower are reflected in the far-right column, under the heading "Cell Location." Contrary to defendant's representations to the Court, these coordinates reflect locations of cell towers, not precise locations of Nunez's phone.

As noted in the AT&T Report, Nunez's phone was an Apple IPhone 5, one of the many models of "smartphones" available on the market. The data generated by AT&T shows that Nunez used his phone to engage in three types of activities: to make and receive phone calls, to send and receive text messages, and to access digital content over AT&T's cellular network. To perform any of these activities, Nunez's phone had to communicate with an AT&T cell tower, thus creating a record kept by AT&T as to the location of the tower accessed by Nunez's phone

5

during that activity. In the upper-left-hand corner of each page in the AT&T Report, AT&T has noted where the CSLI on that page was collected while Nunez was engaged in "Voice Usage" (*i.e.*, phone calls), "Data Usage" (*i.e.*, digital content) or "SMS Usage" (*i.e.*, texting).

Accordingly, the AT&T Report shows, for the requested dates, when Nunez's phone was communicating with cell towers, broken down by activity performed on the phone at the time of the communication. Here is an outline, by page number, of the data contained within the report:

- Pages 1-9, CSLI collected while Nunez was engaging in phone calls, September 22-24

- Pages 10-27, CSLI collected while Nunez was accessing data over AT&T's network, September 22-24

- Pages 28-29, CSLI collected while Nunez was texting, September 22-24

- Pages 30-35, CSLI collected while Nunez was engaging in phone calls, August 31-September 2

- Pages 36-55, CSLI collected while Nunez was accessing data over AT&T's network, August 31-September 2

- Pages 56-64, CSLI collected while Nunez was texting, August 31-September 2

- Pages 65-78, CSLI collected while Nunez was engaging in phone calls, February 1-4

- Pages 79-126, CSLI collected while Nunez was accessing data over AT&T's network, February 1-4

- Pages 127-137, CSLI collected while Nunez was texting, February 1-4

**III.   Argument**

   **A.   The Government Does Not Intend to Present to the Jury the CSLI Collected While Nunez Was Accessing Digital Content Over AT&T's Network, Rendering Nunez's Motion Moot.**

Nunez seeks to suppress certain CSLI that the government had already planned not to introduce at trial. Putting aside for a moment the merits of Nunez's allegations and his exaggerated requests for relief, the government plans to introduce only certain categories of

Nunez's CSLI in its case-in-chief. Specifically, the government intends to present the CSLI collected while Nunez was either making/receiving phone calls or sending/receiving text messages. The government does not intend to present the CSLI collected while Nunez was accessing data over AT&T's cellular network, that is, the CSLI contained on pages 10-27, 36-55, and 79-126.

It is most significant that Nunez does not challenge the collection of CSLI while Nunez was using the calling and texting features on his phone. Nowhere in his motion does Nunez dispute that these records were properly obtained under Fifth Circuit law pursuant to a § 2703(d) order. *See Historical Cell Site Data Opinion*, 724 F.3d at 606. In fact, Nunez outright acknowledges that data collected during these activity periods were rightfully obtained through a § 2703(d) order. Rec. Doc. 396-1 at 6-8. Rather, Nunez takes aim solely at the data collected while Nunez was, according to his motion, not using his cell phone, *i.e.*, accessing data over AT&T's network. Rec. Doc. 396-1 at 3, 8. Nunez cites as an example 140 records beginning on page 10 of the AT&T Report—which, as noted above, refers to the time period when Nunez was accessing digital content. The government is not using this data, so there would be nothing for the Court to suppress. Accordingly, the entirety of Nunez's motion is moot and this Court need take no further action beyond simply denying his motion.

  **B.  The Data Collected While Nunez Was Accessing Digital Content on His Phone Consisted of CSLI, Not GPS Data, and Nunez Voluntarily Provided This Data to AT&T.**

Should this Court feel compelled to address the substantive claims raised in Nunez's motion, the Court will find those claims legally and factually devoid of merit. First, Nunez claims that the government received from AT&T precise GPS coordinates, not just CSLI, in response to its § 2703(d) order. Rec. Doc. 396-1 at 3, 8. This claim is empirically false, and

7

reasonable minds cannot and will not differ on this point.[1] The geographic information contained in the far-right column of the AT&T Report under "Cell Location" shows the coordinates of cell towers, not the GPS geolocation information of the cell phone.[2]

Second, Nunez claims that the government received location data that AT&T had collected while Nunez was not actively using his phone. Rec. Doc. 396-1 at 3, 8. Again, Nunez specifically referenced the time period in the AT&T Report during which Nunez was accessing digital content. *Id*. According to Nunez, this constituted a "search" for Fourth Amendment purposes and required the government to secure a search warrant. *Id*.

If called upon to testify, the government's cell site expert will acknowledge that CSLI is generated by cell phones even at times when users are not directly interfacing with the phones. For instance, depending on a phone's settings, the receipt of email over a cellular connection may generate CSLI even if the user is not actively using the phone. Much like any other data usage, the receipt of an email occurs through communications between a cell phone and cell phone tower, a record of which is created by the service provider.

The logic behind Fifth Circuit cases like *Historical Cell Site Data Opinion* and *Guerrero*, which upheld the use of § 2703(d) orders for CSLI, applies equally to records associated with data usage. In *Historical Cell Site Data*, the court seized upon the fact that the collection of CSLI was being performed by a third party, that is, the cellular service provider, not the government. 724 F.3d at 611-612. The Supreme Court has long held that an individual enjoys no Fourth Amendment protection "in information he voluntarily turns over to [a] third part[y]."

---

[1] Nunez threatens to produce an expert witness who will testify otherwise. Rec. Doc. 396-1, n.3. Beyond this vague representation, Nunez has provided no notice of this expert's identity, background, or qualifications, much less a summary of the expert's opinion.

[2] Yet, even if Nunez's claim were true, how the government would be held accountable for AT&T's misjudgment in sending the government information beyond the scope of its § 2703(d) order is nowhere contemplated in his motion.

*Smith v. Maryland*, 442 U.S. 735, 743-44 (1979). This rule—the third-party doctrine—applies even when "the information is revealed" to a third party "on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *United States v. Miller*, 425 U.S. 435, 443 (1976). Of course, the government does not require cellular service providers to collect and record CSLI. 724 F.3d at 611-612. Accordingly, "cell site information is clearly a business record"—that is, information that a cellular phone user provided to a third party, and which the government requests after the records have already been created. *Id*.

Moreover, "users know that they convey information about their location to their service providers when they make a call and . . . they voluntarily continue to make such calls." *Id*. at 612. For its part, the AT&T privacy policy that was effective as of September 16, 2013, advised customers in no uncertain terms that it would collect their "location information," which included "the whereabouts of your wireless device." *In re Application for Tel. Info. Needed for a Criminal Investigation*, 119 F. Supp. 3d 1011, 1018 (N.D. Cal. 2015), appeal dismissed (Feb. 5, 2016) (citing AT&T's privacy policy). "Location information," according to the policy, "is generated when your device communicates with cell towers, Wi–Fi routers or access points and/or with other technologies, including the satellites that comprise the Global Positioning System." *Id*. The AT&T policy further stated that AT&T "automatically collect[s] information" when the user uses AT&T's network, and that AT&T may provide this information to "government agencies" in order to "[c]omply with court orders." *Id*. Similarly, AT&T's current customer agreement notes that "AT&T collects information about the approximate location of your Device in relation to our cell towers and the Global Positioning System (GPS)." *See* https://www.att.com/legal/terms.wirelessCustomerAgreement.html. And AT&T's current

Privacy Policy advises customers that AT&T "monitor[s], collect[s] and use[s] wireless location information, together with other information we get from our network and your wireless device, to maintain and improve our network . . . ." *See* https://www.att.com/Common/about_us/privacy_policy/print_policy.html.

Suffice to say, customers of AT&T, like Nunez, are on notice that AT&T is collecting their location information. By agreeing to these terms, Nunez, like any other cellular customer, is agreeing to provide this information voluntarily. Put succinctly, "[b]ecause a cell phone user makes a choice to get a phone, to select a particular service provider, and to make a call, and because he knows that the call conveys cell site information, the provider retains this information, and the provider will turn it over to the police if they have a court order, he voluntarily conveys his cell site data each time he makes a call." *Historical Cell Site Data Opinion*, 724 F.3d at 614. *See also Guerrero*, 768 F.3d at 358-59.

There is no reason to attribute such logic solely to phone calls and text messages, at the exclusion of data usage. Nunez's decision to send and receive data from his phone—even in cases where Nunez is not affirmatively using the phone, but the phone is running an application in the background—was voluntary the moment Nunez became an AT&T subscriber. As noted in a recent Fourth Circuit *en banc* opinion:

> To be sure, some cell phone users may not recognize, in the moment, that they are "conveying" CSLI to their service provider. But the Supreme Court's use of the word "voluntarily" in *Smith* and *Miller* does not require contemporaneous recognition of every detail an individual conveys to a third party. Rather, these cases make clear that the third-party doctrine does not apply when an individual *in*voluntarily conveys information—as when the government conducts surreptitious surveillance or when a third party steals private information.

*United States v. Graham*, No. 12-4659, 2016 WL 3068018, at *6 (4th Cir. May 31, 2016) (citations omitted). *See also In re United States*, 622 F. Supp. 2d 411, 419 (S.D. Tex. 2007)

("This court concludes that a request for historical cell-site data when the phone is idle does not raise the same concerns as might a request for real-time cell-site data when the phone is idle, because it does not permit the Government to track the subscriber's or customer's current location.").

### C. Under the Plain Language of § 2703(d), Suppression Is Not Even an Available Remedy.

Even if this Court were to find that the government received cell location information beyond the proper scope of its § 2703(d) order, under the plain language of the statute and under Fifth Circuit case law, suppression is not an available remedy for a violation. The Act has a narrow list of remedies, and—unlike the Wiretap Act, see 18 U.S.C. § 2515—suppression is not among them. *See* 18 U.S.C. § 2707(b) (listing "appropriate relief" as "equitable or declaratory relief," "damages," and "reasonable attorney's fee and other litigation costs reasonably incurred"); 18 U.S.C. § 2708 (providing that the "remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter"); *see also United States v. Smith*, 155 F.3d 1051, 1056 (9th Cir. 1998) (concluding that suppression is not available under the Act); *United States v. Jones*, 908 F. Supp.2d 203, 209 (D.D.C. 2012) (same).

In *Guerrero*, the defendant tried to suppress CSLI obtained after a clear violation of the SCA—namely, the government had obtained CSLI through a subpoena rather than through a court order as required under § 2703(d). 768 F.3d at 358. Unlike a § 2703(d) order, which requires "specific and articulable facts," a subpoena requires no recitation of facts. Nonetheless, the Fifth Circuit found that "suppression is not a remedy for a violation of the Stored Communications Act," noting that "[t]here is no basis for judicial imposition of the exclusionary rule for a statutory violation when Congress has not provided that remedy." *Id*. Accordingly, as

here, even if the government intended to use the contested data in its case-in-chief, and even if the Court were to find that the government violated the SCA through its collection of that data, the defendant is not entitled to the suppression of that evidence.

> D. **Nunez Is Not Entitled to a *Franks* Hearing Because the Government Had No Obligation to Establish Probable Cause for the Acquisition of Nunez's CSLI.**

A "*Franks* hearing," named after *Franks v. Delaware*, 438 U.S. 154 (1978), permits a defendant to challenge the veracity of statements in a search warrant affidavit. Of course, *Franks* does not apply to the instant matter. Put simply, *Franks* deals with probable cause statements in a search warrant. *Id*. Here, the government obtained the contested data through a § 2703(d) order, which merely requires "specific and articulable facts" showing that the requested records "are relevant and material to an ongoing criminal investigation"—a far lesser showing than the probable cause standard. 18 U.S.C. § 2703.

In *United States v. Thousand*, the defendant launched a similar assault on the contents of a § 2703(d) application, seeking suppression of CSLI subject to a *Franks* hearing. 558 F. App'x 666, 668 (7th Cir. 2014). Importantly, unlike the Fifth Circuit, the Seventh Circuit has taken no formal position on whether the collection of CSLI raises Fourth Amendment concerns, and thus requires a search warrant over a § 2703(d) order. Yet, the Court found that "*Franks* cannot be relevant unless the Fourth Amendment is relevant," acknowledging that a *Franks* analysis was not appropriate in cases where, like the present matter, the Fourth Amendment has not been implicated. *United States v. Thousand*, 558 F. App'x 666, 669 (7th Cir. 2014).

> E. **Nunez Has Fallen Well Short of His Burden to Show that a *Franks* Hearing Is Warranted on His Substantive Claims of Government Misconduct.**

Nunez nonetheless attempts to parlay his claim of a Fourth Amendment violation into the basis for a *Franks* motion. That is, Nunez argues that the data provided to the government

pursuant to its § 2703(d) order exceeded the scope of the order, constituted a Fourth Amendment violation, and thus established standing to pursue a *Franks* hearing. No doubt, Nunez's underlying hope is that the Court will grant an evidentiary hearing, where Nunez can examine government witnesses in advance of trial. For reasons discussed above, Nunez's arguments are rendered moot by the government's decision not to use the contested CSLI, and are otherwise devoid of substantive merit.

Yet, should the Court entertain this argument and wish to conduct a *Franks* hearing, the government rejects Nunez's claims in the strongest possible terms. Nunez alleges that the government made assertions "that are provably false, and known to be false by the prosecutor who signed the warrant." Rec. Doc. 396-1 at 1. These are indeed grave allegations of government misconduct, which the defense offers with little support in the record. Specifically, Nunez claims two infirmities in the government's § 2703(d) application: (1) that the government misstated that Nunez texted victim D.D. and admitted that Nunez and she had sex; and (2) that the government omitted the fact that victim J.W. reported no misconduct during her first meeting with police. Rec. Doc. 396-1 at 3-4. These arguments amount to nothing more than rank hyperbole, the reward for which should not be a *Franks* hearing.

To be sure, even where applicable because the Fourth Amendment is implicated, a *Franks* hearing is not freely granted. While the Supreme Court held that in certain narrowly-defined circumstances a defendant can attack a facially-sufficient affidavit, it also recognized a "strong presumption of validity with respect to the affidavit supporting the warrant," thus creating a rule of "limited scope." 438 U.S. at 171, 167.

Specifically, the rule requires a dual showing that incorporates both subjective and objective threshold components. In order to even obtain an evidentiary hearing on the affidavits'

integrity, Nunez must first make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Id*. at 155-56. This showing "must be more than conclusory" and it must be accompanied by a detailed offer of proof. *Id*. at 171. Second, the false information must be essential to the probable cause determination: "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Id*. at 171-72. In the case of an alleged false statement, Nunez would have to first prove the falsehood was deliberately untrue or demonstrated reckless disregard for the truth, and that without the falsehood the government fails to meet the probable cause standard.

The *Franks* test also applies when affiants omit material facts "with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading." *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986). And the same "substantial preliminary showing" must be evident when information is supposedly omitted: that the omission was also made intentionally or with reckless disregard for the omission's tendency to mislead. Additionally, Nunez would have to prove that if the omitted material had been included in the supporting affidavit there would have been no finding of probable cause. *See e.g., United States v. Cleveland*, 964 F. Supp. 1073, 1077–78 (E.D. La. 1997). In short, the *Franks* standard is a high one. *Rivera v. United States*, 928 F.2d 592, 604 (2nd Cir. 1991). *See also United States v. Falso*, 544 F.3d 110, 125 (2nd Cir. 2008) (heightened standard for a hearing is to "avoid fishing expeditions into affidavits that are otherwise presumed truthful").

Nunez fails to make a "substantial preliminary showing" of a knowing or reckless false statement. Any alleged falsehoods or omissions in the § 2703(d) application were not made with

the intent to deceive, nor were any deficiencies material to the probable cause determination. To assess this question, one must look closely at the text message exchanges between not just Nunez and victim D.D., but Nunez and victim J.W.

First, Nunez never used the word "sex" in his text conversation with victim D.D. However, Nunez all but pronounced in stark terms, through crude and boastful innuendo, that D.D. had engaged in a sexual encounter with both Nunez and victim J.W. The evening after D.D. was assaulted in Darren Sharper's condominium, D.D. engaged in a text exchange with Nunez. This text exchange was furnished to the Court as Defense Exhibit H. During the exchange, D.D. confided in Nunez that she could not recall the events of the early morning hours of September 23, 2013. Nunez giddily responded, "I'm nervous to even tell you about anything you don't remember . . . Lol . . . Had a good time last night though!!! Because at the time you seemed aware of everything." When D.D., obviously concerned, pressed for more details, Nunez responded: "The girl that came with us back to the condo . . . Well . . . Had you ever been with a girl before? . . . Well there was, and it started off with y'all making out." D.D., quite reasonably, began to panic about her lack of memory. At that point, Nunez retreated, while continuing to foment D.D.'s suspicion: "Damn I feel terrible now . . . I rather not elaborate . . . I'm sure you can guess the rest." Later, in an effort to pacify D.D., who remained unsettled by Nunez's comments, Nunez told D.D. that "[I]t's not like y'all were rubbing vaginas or anything. Lol."

On these facts, Nunez asks the Court to believe that the government made a knowing, material false representation—no doubt, a most serious allegation—when the government asserted that Nunez texted D.D. that they had sex. Perhaps Nunez did not use the word "sex." However, what other conclusion was D.D. to draw, when confronted with Nunez's suggestion

15

that a sexual encounter occurred between D.D. and unnamed individuals, including another female (J.W.) that D.D. did not know; that Nunez personally "had a good time"; that D.D. seemed aware of "everything," without defining the term; that the encounter "started off with" D.D. and J.W. "making out"; and that Nunez would "rather not elaborate" on the rest?

To the extent that Nunez exercised subtlety in his text exchanges with D.D., he was far less modest in his exchanges with J.W., who the government will prove was also drugged and did not remember the events of the morning. In those text messages, Nunez told J.W. that "we definitely all had sex"—speaking specifically of himself, Darren Sharper, D.D. and J.W. Nunez described in further detail the sex acts that J.W. performed with him and Darren Sharper, and the fact that J.W. and D.D. engaged in oral sex. It is worth mentioning that, later that same evening, Sharper texted Brandon Licciardi and revealed that he was "With Eric [Nunez]. He says that [D.D.] gave him head. And pulled him on top of him [sic]." While these additional text exchanges had not been included in the § 2703(d) application, they are consistent with Nunez's statements to numerous individuals, including the insinuation to D.D. herself, that he had sex with D.D. on September 23, 2013.

Nunez's other allegation of a material defect in the § 2703(d) application—the government's statement that J.W. did not initially pursue the matter, notwithstanding her initial statement to police reporting that no misconduct occurred—warrants no more than a passing consideration by the Court. At worst, the phrasing of this assertion was inartful; however, the assertion remains entirely true, in that J.W. did not initially pursue the matter.

Neither alleged defect supports a preliminary showing that "the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth." *United States v. Canfield.* 212 F.3d 713, 717-18 (2nd Cir. 2000); *see also United States v.*

*Martin*, 426 F.3d 68, 73 (2nd Cir. 2005). And the Supreme Court has recognized the practical necessity that a warrant should not be invalidated by interpreting an affidavit in a hyper technical, rather than a commonsense, manner. *See United States v. Ventresca*, 380 U.S. 102, 108-09 (1965). In recognition of the potential for human error, every statement in a warrant affidavit need not be true. *See Canfield*, 426 F.3d at 73; *Martin*, 212 F.3d at 717. Similarly, an affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation or the history of every false lead or eliminated suspect. *See United States v. Awadallah*, 349 F.3d 42, 67-68 (2nd Cir. 2003).

On the separate question of materiality, Nunez's arguments also fall flat. A misstatement or omission is material if it is "necessary to the [issuing] judge's probable cause finding." *Canfield*, 212 F.3d at 718. To make this determination, "a court should disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support probable cause to issue the warrant." *Id*. If the corrected affidavit supports probable cause, the inaccuracies were not material. Omissions are governed by the same set of rules.

In this vein, it is worth reemphasizing that a § 2703(d) application does not require a showing of probable cause, only "specific and articulable facts." Any argument as to the deficiency in such facts must be viewed in context of the purpose of the application—that is, to show that the requested records are material to an ongoing criminal investigation. § 2703(d). In that sense, the discussion of the investigation contained within the § 2703(d) application, and Nunez's role within the investigation, were more than sufficient to meet this burden. Specifically, the application noted that the FBI had been investigating Nunez's role, alongside Darren Sharper and Brandon Licciardi, in drugging women for purposes of having sex. Defense Exhibit F at 2. The application noted that Nunez had admitted to a government informant that

Nunez was present in the apartment of Darren Sharper during the sexual assault of victim M.B., and had potentially participated in the assault. *Id.* at 4. Furthermore, the application noted that Nunez and Sharper were together, in Sharper's apartment, with victims D.D. and J.W. the evening that the two women were sexually assaulted. *Id*. at 6-7. The application goes on to provide details involving the conduct of Nunez's co-conspirators, who have also been arrested alongside Nunez. *Id*. Such facts go well beyond what is required for securing a § 2703(d) order, and would certainly cure any alleged defect or omission in the recitation of facts relating to the investigation.

## IV.     Conclusion

Simply put, this Court need not hear testimony at a *Franks* hearing to conclude that Nunez's claims are rendered moot by the government's decision not to use the contested data, and are otherwise unsupported by any manner of lawful precedent. What is most concerning to the government, however, is that Nunez again has attempted to raise the specter of government misconduct in the eyes of the Court. In addition to the rank allegations involving the misrepresentations in the § 2703(d) application, Nunez has also alleged that the government intended to withhold the cell site applications and orders "either until the last minute, or altogether." Rec. Doc. 396-1 at 2. Aside from making a passing reference to his prior Motion to Dismiss for Vindictive Prosecution and Motion for Inspection of Grand Jury Materials, both of which were denied by the Court, Nunez articulates no facts to suggest that the Court should reconsider its prior rulings. The reality is that any argument that the government deliberately withheld the applications and orders is entirely conjectural. The government has provided voluminous discovery in this case, to include materials well beyond the scope of those required for production under Rule 16. Yet, as evidenced by its often-repetitive discovery motions, the

defense has continually sought to question and challenge the government's production of materials. Perhaps it should come as no surprise that Nunez does so again, under these circumstances, when the government made available the requested materials within 48 hours of Nunez's May 31, 2016, request.

Yet, on this front, two points are worth emphasizing. First, while the government may not have produced the applications relating to the collection of cell site data until June 2, 2016, the government produced the cell site data itself to Nunez's counsel during a production in September 2015. Alongside that data, the government produced the court order that compelled AT&T to produce the data. Yet, Nunez claims that he was misled into believing that "such materials [*i.e.*, the applications] did not exist." Rec. Doc. 396-1 at 2. While Nunez could choose to acknowledge that he knew the applications existed and waited until the last minute to renew his request for production, Nunez instead chooses to blame the government, all the while insinuating that the government was driven by a sinister motive to avoid production entirely. Secondly, the irony of Nunez's argument is that, despite the government's own discovery requests which also date back to August 2015 (if not earlier), the defense has not yet provided a single page of reciprocal discovery beyond the curriculum vitae of possible defense expert witnesses.[3] In short, this Court need not spend additional time addressing arguments like these; they are wholly without basis and should be denied.

---

[3] Federal Rule of Criminal Procedure 16(b)(1)(C) requires the defendant, at the government's request, to provide a summary of expert testimony if the government complies with a similar request by the defendant. The government has complied with a similar request by the defendant. Nevertheless, defendant's response to the government's request for a summary of expert testimony is an insufficient statement that defendant has provided a CV, but has not yet decided whether the expert will be a witness at trial. *See United States v. Crook*, 479 Fed. Appx. 568, 575–76 (5th Cir. 2012) (finding no abuse of discretion when district court determined e-mail sent to government with expert's résumé was insufficient notice). The government's concern is that, depending on the nature of the testimony, it may be necessary—but impossible because of the late date—for the government to retain an expert of its own if defendant's expert is allowed to testify without having provided a summary.

**WHEREFORE**, because the defense has failed to provide any factual or legal support for its allegations, the United States of America respectfully requests that this Court deny Nunez a *Franks* hearing and dismiss his claims as moot and meritless.

Respectfully submitted,

KENNETH ALLEN POLITE, JR.
UNITED STATES ATTORNEY

s/ Brandon S. Long
BRANDON S. LONG
D.C. Bar No. 500721
Assistant United States Attorney
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130
Telephone: (504) 680-3106
Email: brandon.long@usdoj.gov

### CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2016, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all defense counsel of record.

s/ Brandon S. Long
BRANDON S. LONG
Assistant United States Attorney
