UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL DOCKET NO. 14-284 |
| v. | * | SECTION: "H" |
| ERIK J. NUNEZ | * | |

* * *

# FACTUAL BASIS

If this case were to proceed to trial, the Government would prove the guilt of defendants Brandon Licciardi (Licciardi) and Eric Nunez (Nunez) beyond a reasonable doubt as to Count 1 of the Fifth Superseding Indictment through the introduction of admissible evidence and the testimony of competent witnesses. More specifically, the evidence would establish the following:

During the timeframe of this conspiracy, the defendants and Darren Sharper (Sharper) were acquainted and the defendants were aware that Sharper was providing controlled substances to unsuspecting women and then having sexual relations with them without their consent. On February 1, 2013, Victim1 (V1) was working as a model for the sponsor of a Super Bowl Party at an establishment in the French Quarter. While at the party,V1 met Licciardi. V1 drank alcoholic beverages at the party. V1 remembers having an alcohol drink in her hand at the party but remembers nothing else except later being in a shower with a person she later identified as Brandon Licciardi. Knowing that V1 was incapacitated, Licciardi brought VI to Sharper's condo in the Warehouse District of New Orleans with the intent to have sex with her and to provide Sharper with the opportunity to have sex with her. While at the condo, Licciardi had sex with

E.N.

8AA

V1. Sharper, thereafter, attempted to have sex with her. In later conversations with two friends, Licciardi admitted that he would be in trouble if V1 sought a rape kit and examination.

V1 next remembers waking up naked in a bed with a man she has since identified as Sharper. She knew immediately that she had sexual intercourse at some point during the evening. She did not knowingly consent to have sex with any individual at the condo. She found her clothes in the bathroom and left the condo which was later identified as Sharper's condo. When she reached the street, she called a friend who picked her up. Cell site information was obtained in this matter by the FBI pursuant to a court order. It showed that on the night/morning that V1 was sexually assaulted, the cell phones of Licciardi and Sharper were both at the location of the party at 2:30 a.m. and were together in the Warehouse District where Sharper's condo is located, between 3:15 a.m. and 5:48 a.m. on February 2, 2013. Cell site information further revealed that the cell phone of Nunez was in close proximity to Sharper's condo during this time period. An inmate would testify that While incarcerated, Nunez acknowledged to an inmate that he was at Sharper's condo that night, knew that V1 was incapacitated and that at least one co-conspirator had sex with her.

On September 22, 2013, Victim 2 (V2) went to a Saints game. Afterward, she went to dinner with friends, and then to the Warehouse District of New Orleans where she met other friends. They eventually went to a bar named Ohm where an "after game party" was occurring. Ohm is located very near Sharper's condo. Some New Orleans Saints' football players were in attendance as was Sharper and Licciardi. V2 was a friend of Licciardi at the time and knew him to be a friend of Sharper, though she had never met Sharper. She began talking to Licciardi and he introduced her to Sharper who was accompanied by Nunez. She was not intoxicated at the

E.N.



time. Licciardi introduced her knowing that Sharper in the past had drugged women introduced by Licciardi.

V2, Licciardi, Sharper and several other persons left and went to a club called Republic, but it was closed. Sharper then drove V2 and Licciardi to Jax which is a club in the French Quarter. Soon after arriving, Licciardi indicated that he was leaving and going home. V2 remembers not wanting to remain at Jax because she did not know Sharper. Licciardi indicated that he was going to leave and return to his home in Chalmette, leaving her in the company of Sharper.

While at Jax, Sharper provided "Molly" (a/k/a, MDMA or "Ecstasy") to V2 without her knowledge by putting it in her drink. It was Sharper's intention that he would then have sex with V2. V2 remembers standing by a VIP table and that Sharper gave her a drink. V2 did not see him make the drink.

On the evening of September 22, 2013, Stafford was working as the manager of a French Quarter night club in the 700 block of Bourbon Street called Bourbon Heat. After the club closed at about midnight, he took his staff to Jax Brewery. When Stafford entered the bar area on the second floor, he saw his friend, V2. Stafford is also a friend of Licciardi. Stafford then purchased a round of drinks (shots) for his staff and V2. When Stafford handed the drink to V2, V2 appeared disoriented, confused and her pupils were dilated. V2 did not drink her shot but instead meandered into the crowd. Stafford believed that she had been drugged. V2 appeared to be with Sharper so Stafford asked Sharper if V2 was alright and he replied with words to the effect of, "She's ready, she's on the potion." Sharper then took V2 by the hand and led her from the bar.





Victim 3 (V3) was at Jax Brewery on the evening of September 22, 2013. While at Jax, she met Nunez, a person she had known for several years. Nunez is also a friend of Sharper and is known to Licciardi. When V3's girlfriend decided to leave Jax, V3 asked Nunez if he would give V3 a ride home. Nunez texted V3 asking if she was ready to leave with him, which she did. The text occurred at approximately 2:50 a.m. on September 23, 2013. V3 met up with Nunez, Sharper and a blonde female she did not know, later identified as V2. They departed Jax Brewery in Sharper's car. Sharper drove and V2 ~~Nunez~~ sat in the front-passenger seat. Nunez and V3 sat in the rear passenger seats. ~~V3 and V2 were in the back seat~~. V3 believed Sharper was taking them to where Nunez had parked his car. Instead, they arrived in a parking garage in an unknown location which was later identified as Sharper's parking garage. V3 recalled stepping out of the car, and helping V2, who seemed very unsteady. All four persons entered Sharper's condo. Once inside, Sharper put Zolpidem (Ambien) in the drink of V3 without her knowledge or consent. Sharper had previously put Molly in a drink of V2 without her knowledge or consent. Thereafter, Sharper had sexual intercourse with V2 and V3 while they were incapacitated. An inmate would testify that Nunez told an inmate that ~~he and~~ Sharper ~~both~~ had sex that night with V2 and V3, and that Nunez committed a sexual battery on V2 and V3.

After V2 left Jax with Sharper, Stafford called Licciardi at his residence. Stafford told Licciardi that he had seen V2 leave with Sharper and that he believed she had been drugged. Aware that Licciardi and Sharper were friends and that Licciardi was a law enforcement officer, Stafford asked Licciardi to go to Sharper's condo and determine whether V2 was in need of assistance. Licciardi agreed and arrived a short time later at Sharper's condo. Stafford arrived shortly thereafter. Licciardi entered the condo on three occasions knowing that Stafford had told him that V2 had been drugged. Even though Licciardi never viewed V2 to determine her



physical and mental state as requested by Stafford, Licciardi assured him that nothing was amiss and that the victims were not in any danger or trouble.

V2 remembers nothing that occurred after leaving Jax. When she awoke naked in Sharper's condo at 10:00 am, Sharper was on top of her. V2 told him to stop and he did. He called her a cab. She was disoriented. V2 found her clothes, dressed and went outside. There were cabs across the street at the Renaissance Hotel and she took one to her car. V2 was certain that she had sex. When V2 arrived home, she immediately went to sleep. V2 did not knowingly consent to have sex with Sharper, or to have Nunez. commit a sexual battery.

V2 contacted Stafford who told her that he and Licciardi had visited the condo during the early morning hours. After V2 expressed her confusion about what happened the previous night Stafford told her that she needed to go to the hospital to be tested for proof that she had been drugged and raped. Later, V2 engaged in a text exchange with Nunez during which she asked Nunez if she had fallen down. Nunez said no and then, in a series of text messages, indicated that she had sex with V3 and insinuated that she had sex with others. It is clear from the text messages as indicated by V2's text message responses that she had little recollection of what had occurred at Sharper's condo and was unaware that a second woman was present. At midnight the next day, V2 went to the hospital to have a rape kit done. V2 also made a report to the New Orleans Police Department (NOPD).

When V3 awakened the next morning, she was disoriented, naked, and remembered little about the night before once she arrived at Sharper's condo. Though still under the effects of being drugged, V3 remembers that a naked, black male later identified as Sharper walked into the room. Sharper then got on top of her and had sexual intercourse with her. It lasted "a couple of minutes." Afterward, Sharper left the room, she again lost consciousness, and awoke later in



the same bedroom. V3 continued to be disoriented but was now experiencing pain in her face. She still did not recognize where she was. V3 found her clothes, dressed and texted Nunez at approximately 7:50 a.m. on September 23, 2013, in an attempt to determine what happened but he did not immediately reply. She left the bedroom and walked through the apartment. She found a locked door she assumed was a bedroom, but apparently no one was present. She then called a friend who stated she would come get her. V3 was able to utilize the GPS function on her phone to establish her location. Her friend came and picked her up.

The Federal Bureau of Investigation Crime Laboratory conducted testing on the hair of V1 and V3 using advanced detection technologies to determine the presence of certain drugs. The testing protocols used by the Crime Laboratory were designed to detect the presence of benzodiazepines in a hair sample; however, they were not designed to detect the presence of Molly (*i.e.*, MDMA). The testing process is a test of inclusion and not exclusion, that is, a positive result shows a certain substance was ingested but a negative result does not rule out that ingestion did occur. This testing revealed that V1 tested positive for the presence of Alprazolam (Xanax), clonazepam, 7-Aminoclonazepam, diazepam (Valium), nordiazepam (Valium Metabolite) and that V3 tested positive for the presence of Zolpidem (Ambien), and that these substances were administered to the victims without their knowledge. An expert would testify that these drugs are used as date rape drugs and that they cause victims to have blackouts, memory loss and an inability to make rational or reasoned decisions. Ingestion of these drugs will also cause a loss of social restraints and cause the victims to engage in sexual behavior in which they would not normally engage.

The Louisiana State Police Crime Laboratory conducted DNA testing on a strain on the blue jeans of V2 which she wore on the night of the sexual assault and which were seized by the



New Orleans Police Department. A DNA profile was also developed from swabs taken from Sharper and Nunez. Testing revealed that the stain had a mixture of three contributors, one major and two minor. The DNA profile obtained from the major contributor of that stain was consistent with the DNA profile of Sharper. The DNA profile obtained from one of the minor contributors of that stain was consistent with the DNA profile of Nunez. A further DNA profile was developed from a perineal swab taken from V2 during her rape examination. This profile was consistent with the DNA profile of Sharper.

A security camera video was obtained for the parking garage of Sharper's condo complex. It is date/time stamped 3:00 a.m., September 23, 2013. The video shows Sharper, Nunez, V2 and V3 getting out of the Range Rover. V3 had to assist V2 who appeared disorientated and stumbling. The security cameras show the four of them walking from the garage to an elevator, taking the elevator to another floor, and crossing a hall to enter Sharper's residence.

After V2 reported to law enforcement that she believed that Sharper drugged and raped her, and both Licciardi and Nunez had learned of the accusations, Sharper and Nunez disposed of their cell phones to conceal from authorities text messages, photographs and videos that were evidence of the conspiratorial activities set forth above. When first interviewed by law enforcement, Licciardi falsely claimed that his cell phone broke and was destroyed. At the time, Licciardi knew that his cell phone contained text messages of conversations with Sharper, Stafford, and V2, as well as a video and photographs, which taken together and collectively ~~that~~ exposed the criminal acts of Sharper and Nunez and demonstrated that Licciardi was aware of their criminal conduct.

During three separate interviews with law enforcement, though Licciardi ultimately talked about the contents of his cell phone once a family member made the cell phone available

E.N.



to law enforcement, Licciardi continued to conceal his total knowledge of Sharper's involvement with other women introduced by Licciardi whom Sharper incapacitated in an effort to have sexual intercourse without the women's consent.

An inmate would testify that While Nunez has been incarcerated, he has told an inmate about his knowledge and involvement with Sharper and Licciardi in the above-described conspiratorial conduct. That inmate would also testify that Nunez ~~He also~~ described in detail drugging a woman in an attempt to have sex with her while he was on bond in the Orleans Parish criminal case.

Sharper was at the center of the conspiracy charged in Count 1 of the Fifth Superseding Indictment. Licciardi and Nunez became aware of Sharper's criminal conduct of drugging women and then having sexual relations with them without their consent. Rather than expose Sharper's activities, these defendants assisted him in his objectives as described above and joined with Sharper to obstruct the law enforcement investigation by destroying evidence of the conspiracy and concealing the facts.

E.N.

The involvement of Licciardi and Nunez in the conspiracy charged in Count One of the Fifth Superseding Indictment is not limited to the facts contained in this stipulated factual basis. These facts are merely a summary of their involvement in this conspiracy and are presented in this document to support his plea of guilty to Count One in the Fifth Superseding Indictment.

Kenneth Allen Polite, Jr.
United States Attorney

7/9/16
Michael E. McMahon — Date
Assistant United States Attorney

7/9/16
Theodore Carter — Date
Assistant United States Attorney

7/9/16
Eric Nunez — Date
Defendant

7/9/16
Brandon Long — Date
Assistant United States Attorney

7/9/2016
Sara Johnson — Date
Attorney for Defendant